UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

SHREVEPORT DIVISION

| | | |
|---|---|---|
| JA'VEL COLEMAN | ) | |
| | ) | |
| VERSUS | ) | CIVIL ACTION |
| | ) | NO: 5:24-CV-00512 |
| TARA NATIONAL, INC., | ) | |
| ET AL | ) | |

REMOTE DEPOSITION OF JOSH LORENCZ

March 18, 2026

Stenographically Reported By:
Jayne M. Reeves, CCR



**EXHIBIT B**

APPEARANCES:

COUNSEL FOR PLAINTIFF JA'VEL COLEMAN:

MR. BRIAN D. LANDRY
Dudley DeBosier, APLC
4300 Youree Drive, Suite 250
Shreveport, Louisiana 71105
318.670.7365
225.670.7417 - Facsimile
blandry@dudleydebosier.com

COUNSEL FOR DEFENDANT TARA NATIONAL, INCORPORATED:

MR. ALEXANDER J. BREWSTER
Pugh Accardo
1100 Poydras Street, Suite 3600
New Orleans, Louisiana 70163
504.312.4708
504.799.4520 - Facsimile
abrewster@pugh-law.com

COUNSEL FOR DEFENDANT MARCKSON SAINT FLEUR:

MR. CHRISTOPHER M. UTLEY
Boykin & Utley, PLC
400 Poydras Street, Suite 1540
New Orleans, Louisiana 70130
504.527.5450
504.527.5436 - Facsimile
cmu@boykinandutley.com

COUNSEL FOR DEFENDANT NAVIGATORS INSURANCE COMPANY:

MR. THOMAS (LOUIS) L. COLLETTA
Lugenbuhl, Wheaton, Peck, Rankin & Hubbard
601 Poydras Street, Suite 2775
New Orleans, Louisiana 70130
504.568.1990
504.310.9195 - Facsimile
lcolletta@lawla.com

ALSO PRESENT: Christopher Arreola, Videographer

S T I P U L A T I O N S

The remote deposition of JOSH LORENCZ, taken by Mr. Brian D. Landry, counsel for Plaintiff, pursuant to notice and agreement by and between counsel, for all purposes as allowed by the Federal Rules of Civil Procedure, before Jayne M. Reeves, Certified Court Reporter, in Dallas, Texas, on March 18, 2026.

It being stipulated by and between counsel that all formalities, with the exception of the swearing of the witness, are waived.

It being further stipulated that the reading and signing of the deposition are waived by counsel and by the witness.

It being further stipulated that all objections except as to the form of the question and responsiveness of the answer are reserved until the time of trial.

# I N D E X



| | PAGE |
|---|---|
| Examination by Mr. Landry.................. | 5 |
| Examination by Mr. Brewster................ | 47 |



## E X H I B I T S



| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Ex. A | Notice of Video Deposition | 6 |
| Ex. B | Report of Findings dated January 27, 2026 with Attachments: Figures 1 through 6 and Josh Lorencz's Curriculum Vitae | 7 |
| Ex. C | Rimkus Professional Fees Schedule Effective October 1, 2025 | 7 |
| Ex. D | Josh Lorencz's list of federal, state and deposition testimonies | 8 |

P R O C E E D I N G S

THE VIDEOGRAPHER: We are now on the record. Today's date is March 18th, 2026. And the current time is 10:01 a.m.

Will Counsel please identify themselves for the record.

MR. LANDRY: Brian Landry, counsel for the Plaintiff.

MR. BREWSTER: Alex Brewster, counsel for Tara National, Incorporated.

MR. COLLETTA: Louis Colletta, counsel for Navigators Insurance Company.

MR. UTLEY: Christopher Utley, counsel for Marckson Saint Fleur.

THE VIDEOGRAPHER: And would the court reporter please swear in the witness.

***

JOSH LORENCZ,

the witness, having been remotely sworn, testified as follows, to wit, beginning at 10:01 a.m.:

EXAMINATION

BY MR. LANDRY:

Q. Thank you, sir. If you would, please state your full name.

A. Sure. Joshua Scott Lorencz.
Q. Mr. Lorencz, my name is Brian Landry. I thank you for being here. I am going to share something on my screen right now, which is just sort of a matter of housekeeping.
MR. LANDRY: Everyone, this is the deposition notice. I'm going to mark it as Exhibit A and attach that first to the deposition.
And, Jayne, I'll send those to you after the deposition today.
THE COURT REPORTER: Okay. Thank you.
(Deposition Ex. A was marked for identification.)
Q. (BY MR. LANDRY) Mr. Lorencz, you prepared an expert report dated January 27, 2026; is that correct?
A. Yes.
Q. I'm going to show you what I intend to mark as Exhibit B. Can you identify this as the report that you prepared on that date?
A. Yes.
Q. Okay. The document itself is 13 pages long. It includes, I believe, your report; some

figures that go along with your report; and then it also includes your curriculum vitae.

Can you identify beginning at page 10 -- let's see, it looks like it's a cover -- cover letter beginning at page 9 of 13. Is this your curriculum vitae?

A. Yes.

Q. All right. Next I am going to show you a document --

MR. LANDRY: We'll mark that as B.

(Deposition Ex. B was marked for identification.)

Q. (BY MR. LANDRY) Next I'll show you the Professional Fees Schedule for Rimkus. Do you identify this as the fees schedule for the company that you work for?

A. Yes.

MR. LANDRY: All right. I will mark that as Exhibit C.

(Deposition Ex. C was marked for identification.)

Q. (BY MR. LANDRY) And then as D, I am sharing a screen that shows Josh Lorencz's trial testimony, federal and state. It looks to be two pages. Can you identify this document?

A. Yes.
MR. LANDRY: All right. I will mark that as D, then.
(Deposition Ex. D was marked for identification.)
Q. (BY MR. LANDRY) All right. Do you have a copy of your report there with you?
A. I have a printed copy of my report.
Q. Great. And this report was addressed to Mr. Alexander Brewster of the Pugh Accardo Law Firm; is that correct?
A. Yes.
Q. Do you understand that this report contains your opinions in this case?
A. Yes.
Q. And you understand that at trial, you're only permitted to testify to opinions disclosed in the report or through any supplemental report. Do you understand that?
A. Yes.
Q. Have you supplemented your report in any way since January 27, 2026?
A. No.
Q. So your January 27, 2026, report is the complete and total expression of your opinions in

this case; correct?

MR. BREWSTER: Objection to form.

A. Yes.

Q. (BY MR. LANDRY) Have you reviewed your report in preparation for the deposition today?

A. Yes.

Q. And is your report accurate?

A. Yes.

Q. Do you stand by everything that's in your report?

A. Yes.

Q. Is there anything in your report you'd like to clarify, change or correct before we begin?

A. Not that I'm aware of.

Q. All right, Mr. Lorencz. Let's go through the report section by section so I understand exactly what you're saying. Is that fair?

A. Yes.

Q. Your report has a section entitled Conclusions. Do you see that?

A. Yes.

Q. Let's go through each statement in your conclusions. I'll read it, and you tell me is

this an opinion you're offering, is this -- what is the factual basis for your opinion, and what documents or materials you relied on for that report. Okay? That just kind of sets the stage about where we're going.

Opinion 1. The Call Detail Records provided show seven transactions on the subject number between 11:30 a.m. and 5:30 a.m. on May 10, 2023.

Did I read that correctly, sir?

A. I apologize. Did you say you were reading --

Q. Hold on. I'm sorry.

A. -- Conclusion 1?

Q. Hold on one second.

THE COURT REPORTER: I'm sorry. Was that Mr. Utley that spoke?

MR. UTLEY: No. No, I didn't.

MR. LANDRY: Let me rephrase that question. We're going to start over.

Q. (BY MR. LANDRY) Number 1 states, Conclusion. An incoming call was received from (786) 716-2243 on 5/10/2023 at 12:50:52 a.m. and had an elapsed time of 11 seconds.

Is that an opinion you're offering in

this case or is it something else?

A. I believe you misstated the last four digits of the phone number. But as it's written, that's a conclusion from reviewing the Call Detail Records from AT&T.

Q. What specific documents did you review in forming that conclusion?

A. The AT&T records.

Q. That's the AT&T CDRs?

A. Yes.

Q. Did you rely on anything outside of the AT&T records to form this conclusion?

A. No.

Q. Did you rely on any scientific literature, treatises or studies to form this conclusion?

A. No.

Q. So this is purely an observation from the AT&T records; is that correct?

A. Yes.

Q. So if we went through each of the seven that are listed in your conclusions, would your response be the same? Your only source is the AT&T records?

MR. BREWSTER: Objection to form.

A. Yes.
Q. (BY MR. LANDRY) Okay. And for a determination as to the duration of any phone call or the existence of any test, your only source is the AT&T records; correct?
A. Yes.
Q. All right. So Mr. Lorencz, it appears that the information you looked at on the AT&T records show seven transactions on the subject number between 12:30 a.m. and 5:30 a.m.; is that correct?
A. Can you please restate the time frame?
Q. 12:30 a.m. to 5:30 a.m. on May 10, 2023.
A. Based on my conclusions, the time frame would be 12:50:52 a.m. to 5:24:37 based on opinions 1 through 7.
Q. Were there any -- were there any numbers or transactions that were revealed outside of that time frame in the materials that you were provided?
A. I believe there are other transactions outside of that window. Yes.
Q. How did you choose this window to limit your analysis to?

MR. BREWSTER: Objection. Form.
A. These were the last records for the last two hours interacted with which cover this duration of time. However, I believe one of my figures shows overall activity for the day, which would represent the towers other transactions were conducted on. They're just not articulated because they don't appear relevant to the question at hand for me.
Q. (BY MR. LANDRY) And what was the question at hand for you?
A. The location of the device in the relevant times that I've discussed in my conclusions prior to the accident.
Q. Were you able to state or find the actual location of the device during each of the seven transactions?
MR. BREWSTER: Objection to form.
A. It's impossible to find the true location, as in GPS, down to a certain location. You can only rely on the tower and sector of the tower. So whatever the serviceable range is of that tower at that time.
Q. (BY MR. LANDRY) The cell phone transaction -- the cell phone tower associated

with these transactions, I believe it was listed as eNodeB 183361; is that correct?
A. I'll have to refer to the diagram, because there's two different towers. Are you speaking of the first tower?
Q. I'm talking about the second tower, the tower that was closest to the crash time.
A. eNodeB 183361.
Q. And you indicate that that tower is approximately 1.3 miles from the collision site; is that correct?
A. Correct.
Q. How did you determine the collision site?
A. It's listed as an approximate collision location based on the information in the collision report.
Q. Was there any documents that you relied upon in forming your opinions other than the collision report and the AT&T documents?
A. No.
Q. Did you personally verify the physical location of this tower?
MR. BREWSTER: Objection. Form.
A. Can you clarify what you mean by

personally verify?
Q. (BY MR. LANDRY) Did you in any way other than using CellHawk database personally verify the location of the tower?
A. From the GPS coordinates provided in the Call Detail Records.
Q. Did you go to the tower to see?
A. I did not.
Q. Did you go to the site of the crash?
A. I did not.
Q. What is the CellHawk database?
A. CellHawk is a forensic tool used to plot cell site location information from Call Detail Records. When you refer to it as a database, it's in that reference where this data resides at this particular time that was analyzed.
Q. Did that -- did the CellHawk software tell you where the cell location was? Is that how you derived that?
A. It interprets the Call Detail Records that I provided and maps them.
Q. Have you received any training to utilize the CellHawk system?
A. Yes.

Q. When did you receive that training?
A. I would have to estimate it was approximately 2016.
Q. Did they provide some type of certification?
A. I was in attendance for the course that was put on by the owner of the company.
Q. Have you attended any refresher courses or follow-ups?
A. I have not.
Q. Do you have any understanding of the scientific technology or the algorithms that are used by the software itself?
MR. BREWSTER: Objection to form.
A. Can you be more specific of what it is that you're asking?
Q. (BY MR. LANDRY) Sure. Explain -- let's do it this way. Explain to me how you use the CellHawk system to make these determinations. What do you do physically?
A. I provide the records, i.e., AT&T Call Detail Records. They're ingested into the system. And at that point, they can be plotted and analyzed.
These can also be verified manually by

taking the records in their raw form and inputting a GPS location to validate that they match how they're being input into the system.

Q. Do you know how the software works?

MR. BREWSTER: Objection. Form.

A. That's a bit too vague for me. Can you specify what it is you want to know about the program?

Q. (BY MR. LANDRY) Do you -- so what I understand is you put information in. How do you put the AT&T records into the system?

A. There's a feature where you can upload the records and account for the proper timestamp or the proper time zone, and it ingests the records.

Q. Do you know how that ingestion occurs?

A. The back-end functionality of how it goes and interprets it is not something that they provide end users.

Q. Is it the CellHawk software itself that includes the tower location data?

A. No. That data comes from the records.

Q. Did you do anything to independently verify that the AT&T records were accurate?

MR. BREWSTER: Objection. Form.

A. Not in this case. No.

Q. (BY MR. LANDRY) Have you done so in other cases in the past?

A. I have.

Q. And how would you go about that verification?

A. You can plot them manually through a simple entry of the GPS locations into just a Google search bar just to get the physical location of the tower; or you can use Google Earth, and you can input the GPS location as well as the azimuth, which would give you the direction of the sector of the tower, and you can validate it that way. And I've done that in previous cases.

Q. Why did you not do that on this case?

A. This tool has been used by me hundreds of times and dates. Not had a problem.

Q. Do you know the manufacturer of this system?

A. It's currently operated by LeadsOnline. However, Michael Nelson, who is the person that created it, has since retired and sold the company to LeadsOnline.

Q. So is it correct to say that CellHawk

doesn't add any data that was already in the AT&T records?

A. When you say "add data," in what way?

Q. Any type of information that's outside of just the AT&T records in order to make a mapping or a plotting.

A. No, not to my knowledge. I don't believe they add anything to it.

Q. So what this software does or what this program does is it takes CDR data and it displays it in some visual form? Is that what it does?

A. I think that's a good summary.

Q. And it shows tower map locations on a -- tower locations on a map; is that correct?

A. It can. Yes.

Q. And those are the figures -- Figure 1, 2 and 3, 4, 5, 6, 7 -- 6. You provided six figures, I think. And those are the ones that you produced through the use of the software?

A. That is correct.

Q. But in this particular case, you did not do any confirmations on using the GL description at all yourself? You trusted the software; right?

MR. BREWSTER: Objection. Form.

A. Correct. I did not use a secondary tool to validate those locations.

Q. (BY MR. LANDRY) I want to ask a couple of things about your report and things that are not in your report. Do you offer any opinion or conclusion relative to who was using cell phone (772) 882-1219?

A. I do not.

Q. Do you offer any opinion or conclusion about the phone user's physical location during the phone transactions?

MR. BREWSTER: Objection. Form.

A. When you say the phone user's physical location, you're asking if I know exactly where Mr. Marckson Saint Fleur was when the phone was used?

Q. (BY MR. LANDRY) Yes.

A. No, I don't offer an opinion on that.

Q. Do you offer any opinion or conclusion as to the content of any communication on May 10, 2023?

A. No.

Q. Do you offer any conclusion or opinion as to whether the calls were handsfree or handheld at the time?

A. No.
Q. Do you offer any opinion or conclusion about whether any incoming communications were actually seen or responded to?
A. No.
Q. Do you offer any opinion or conclusion as to whether or not the user of the phone during any of these transactions was driving a motor vehicle at the time?
MR. BREWSTER: Objection to form.
A. No.
Q. (BY MR. LANDRY) Do you offer any conclusions or opinions about whether or not any phone activity by the driver would affect the driver's judgment or decisions?
MR. BREWSTER: Objection to form.
A. No.
Q. (BY MR. LANDRY) Do you offer any opinion or conclusion as to whether the phone use in this case played any role in causing the collision?
A. No.
Q. Do you offer any opinion or conclusion as to whether or not any phone use violated any laws, regulations or company policies?

MR. BREWSTER: Objection to form. And objection -- never mind.
A. No.
Q. (BY MR. LANDRY) Do you offer any opinion as to whether the driver was operating a vehicle during any phone activity?
MR. BREWSTER: Objection to form.
A. I believe you asked that already. Is that not correct? For the record.
MR. LANDRY: If I did, I apologize. I'd like to have an answer to it, though.
A. No.
Q. (BY MR. LANDRY) So let me understand the complete scope of your opinions. You analyzed AT&T call data records for the phone number (772) 882-1219; correct?
A. Yes.
Q. You identified seven transactions between the time period you stated on May 10th, 2023; correct?
A. Yes.
Q. You noted in your report the specific times of these transactions; correct?
A. Yes.

Q. And you identified the transactions were incoming versus outgoing; correct?
A. Correct.
Q. You also noted the duration of the calls; correct?
A. Can you -- is that the same as the question before? You said incoming and outgoing? Is that what you said prior?
Q. No. Duration of calls, how long they lasted.
A. Yes, I did notate duration. Yes.
Q. And then you identified the cell tower from these transactions used based on the information provided and interpreted by the software program; correct?
A. Correct.
Q. So you are unable to identify user identity; is that correct?
MR. BREWSTER: Objection to form.
A. Yes. It's improper to assert knowledge of who's physically holding a device when it's being used when you're not present.
Q. (BY MR. LANDRY) And you provide no conclusion about driver behavior or distraction or any decision-making impact; correct?

A. Correct.
Q. You also offer no opinions on regulatory compliance or the content of the communications; correct?
MR. BREWSTER: Objection to form.
A. Correct.
Q. (BY MR. LANDRY) And you don't know whether the communications were actually seen or responded to; is that correct?
A. Correct.
Q. And if I understood you correctly earlier, you looked at Louisiana Uniform Motor Vehicle Crash Report Number 23-074062 and AT&T Call Detail Records. Those are the only two documents that you relied upon; correct?
A. That's correct.
Q. Okay. You didn't review any deposition transcripts in this case?
A. I have not.
Q. Is that unusual, not to review deposition transcripts in your practice?
MR. BREWSTER: Objection to form.
A. I wouldn't say it's unusual. I tend not to read them unless I'm asked to read them. In this case, my charge didn't require them to be

reviewed.

Q. (BY MR. LANDRY) Specifically, what was your charge?

A. To identify what these records had to say about device usage in and around the time of the collision.

Q. And that didn't include who might be using the devices or what was said?

A. Well, that's not how these records are interpreted. Like I said, I'm not present at that location to know who was using it. I can tell from the records who it's registered to, but my charge was to just identify the transactions and provide context to them.

Q. In the course of your report, you had identified the -- let's call it the other number, a number that was not Marckson Saint Fleur's number, did you not?

A. By phone number of the other party, attributed to a text or a call? Is that the question?

Q. Yes. Yes.

A. I did.

Q. Okay. Did you at any time attempt to ascertain who that number belonged to?

MR. BREWSTER: Objection. Relevancy.

A. I don't recall if I looked that up or not. It's impossible without a subpoena to factually know who's attributed to that phone number.

The only thing I would be able to rely on is some open-source tool. But, again, that's not reliable without a subpoena to a service provider to validate who controls those records.

Q. (BY MR. LANDRY) So you used no available Google or reverse number lookup to see who that was?

MR. BREWSTER: Objection. Relevancy.

A. I don't recall from this position now looking at my report doing that for this case.

THE COURT REPORTER: I'm sorry. Could you repeat that answer, please?

A. Sure. I said I do not recall right now from this position looking at my report doing that for this case.

Q. (BY MR. LANDRY) Okay. Have you done that in other cases?

A. Yes.

Q. And for what circumstance would you seek that information? What would you find useful in that?

MR. BREWSTER: Objection to form. Relevancy.

A. If asked to do so, it may be relevant if the requesting party is looking for other potential witnesses or persons to speak to.

Q. (BY MR. LANDRY) In the course of doing your work, had you looked at any GPS data or electronic logging device data from the company?

A. No.

Q. In your past experience in working cases, have you done such a thing in the past?

A. Yes.

Q. Did you ask for it here?

A. I did not specifically ask for that. No.

Q. How would you utilize that information in your report if you had had GPS data or electronic logs?

A. If I had GPS data, I would use it and overlay it along with these records.

Q. And what would that help show?

A. A more precise location at a specific

moment in time.

Q. And you did not request that data?

A. I did not request it.

Q. Did you review any photographs or videos from the scene?

A. No.

Q. Were you able to attribute the number that you were focused on, which ended in 1219, with Mr. Marckson Saint Fleur, the driver in this case?

A. I believe I have the subscriber information in the record set that was sent to me. However, I did not specifically note that in my report. So I would have to go back to that subscriber record and confirm his name is attached to it.

Q. Sir, is there any scientific literature that you relied upon in forming your conclusions?

A. Not specifically. No.

Q. Generally, any literature?

A. I've read books from a previous employer that were specific about -- specifically written about cell tower locations and analysis, and I've taken a series of courses which cover cell tower information.

Q. All right, Mr. Lorencz. What's your educational background?
A. My degree is in finance with an option in real estate.
Q. And in what year did you obtain that degree?
A. I believe 2002. I'd have to fact-check my own CV for that.
Q. Do you have any degrees in computer science?
A. No, I do not.
Q. Do you have any degree in telecommunications?
A. No, I do not.
Q. Do you have any degree in engineering?
A. No, I do not.
Q. Any degree in forensic science?
A. No, I do not.
Q. Your CV lists numerous certifications. You were certified by Cellebrite, C-E-L-L-E-B-R-I-T-E; is that correct?
A. Cellebrite? Yes. A forensic tool.
Q. Okay. What type of company is that? What do they do?
A. They deal with cell phone analysis. So

extracting data from phones and providing a tool that allows you to analyze it.

Q. Did that certification bear any importance in the work you did in this case?

A. No.

Q. Was that certification basically completing some type of training on how to use that product?

A. Depending on which one. There's several. But yes.

Q. Magnet Forensics certification. Can you tell me what that was?

A. Yes. There's multiple certifications from them. But they center around phone analysis, computer analysis, and cloud-based evidence analysis. And they have --

Q. Did that -- I'm sorry. I didn't mean to interrupt you.

A. They have the ability to provide GPS information on a map overlay, as well as if that information comes from a device. Both of them do, Cellebrite and Axiom.

Q. Did you use any of that certification in preparing your report in this case?

A. Not directly.

Q. How did you use it indirectly?
A. Well, I feel the course of questioning is trying to indicate that my training has no value to these records.
But overall, my training in general, with over 1100 hours, as documented in my CV, all in a way contribute to my ability to perform the job that I did in this case; because I can draw from all of the different aspects of conducting an investigation, whether it be from the phone, a GPS device or records, in order to better conduct analyses and provide opinions.
Q. Why didn't you do that in this case, then, and draw from those?
A. Well, I didn't say that I didn't. I said what those tools specifically are meant to function as. They don't have a direct application for Call Detail Record analysis.
Q. That was outside of the limited scope that was given to you by the defense firm that hired you; correct?
MR. BREWSTER: Objection to form.
A. No. They don't have an application to analyze these records.
Q. (BY MR. LANDRY) Your task in this case

given to you by the defense firm was not to do any of that, was it?

MR. BREWSTER: Objection to form.

A. Please clarify the question.

Q. (BY MR. LANDRY) If you had been provided GPS data, you could have used the GPS data to show us exactly where the truck was at any given time during these call or text transactions; correct?

A. In general, yes, if the GPS data had a level of accuracy attributed to it.

Q. If you added the electronic log, would that have added the level of accuracy as well?

MR. BREWSTER: Objection. Calls for speculation.

A. I would have to see the specific log and the dataset to determine if it had a horizontal accuracy or level of precision for the GPS location. If it did, yes, I could plot it.

Q. (BY MR. LANDRY) My understanding is you worked as a police officer for Simi Valley Police Department from 2005 to 2021. Is that correct?

A. Yes.

Q. And what did you do when you were

there?

A. I started as a patrol officer. I worked as a gang officer. I trained officers for about five years. And then for the last eight or so years, I was a detective. And in that assignment, I handled property crimes, I worked on an auto theft task force, and I had an ancillary assignment of conducting all visual forensics for the agency.

Q. Does that mean you built the digital -- or the computer forensics lab for them? Is that what you did?

A. Yes. I handled any digital forensic evidence for them through the lab that I built. Yes.

Q. So your investigations included financial crimes; is that right?

A. Yes.

Q. Theft cases?

A. Yes.

Q. Any child exploitation?

A. Yes.

Q. Any of your work during that time period relate to what you were asked to do in this case in plotting the cell phone locations?

A. Yes. I plotted cell phone locations in several cases, investigations.

Q. And why would you do that in the criminal cases or the investigatory cases?

MR. BREWSTER: Objection. Relevancy.

A. Many of the cases where I had to do that were a crime series. And so when we identified a suspect, we would gather phone records that were suspected to belong with them to try and tie them to the general area of a crime scene to then aid the investigation, which may lead to putting aatracker on a car and following them around and watching them commit other crimes.

Q. (BY MR. LANDRY) Why did you leave the police department?

A. I wanted to leave California, move to Texas.

Q. You now live in the Houston area; is that right?

A. That's our corporate area. I live in North Texas, north of DFW.

Q. And you started doing the consulting work in 2021 when you left?

A. That's correct.
Q. You worked for Envista Forensics, I think, from 2021 to 2025. Can you describe that company to me?
A. Yes. They perform the same essential services as the company I work for now, and specifically they had a digital forensics operation that I worked for.
Q. And why did you leave that company?
A. For a different opportunity.
Q. Okay. And what does Rimkus do now?
A. They offer several consultant services across numerous business lines. I don't have familiarity with all of them. But in the realm of what we do, they have accident reconstructionists for accidents, they have biomechanical experts, they have human factors experts, and they have folks like me that analyze digital evidence in our transportation realm.
THE COURT REPORTER: I'm sorry. What was that last part?
THE WITNESS: Digital forensics analysts such as myself in the transportation realm, I think was the last part. Maybe I left -- you got the rest of it?

THE COURT REPORTER: Yes. Thank you.

Q. (BY MR. LANDRY) In looking at page 11 of your CV, you list some presentations. I'd like to go through them for a second with you.

You list a cell phone forensics for trucking defense that was presented to CLM Trucking Defense Advocacy Council; is that correct?

A. Yes. I didn't print that part of my report, so -- but I do recall doing the CLM, though.

Q. Okay. It looks like you may have presented the same type of CLE to multiple groups. One is the National Truck and Heavy Equipment Claims Council; as well as what I said, CLM Trucking Defense Advocacy Council.

Is that the same presentation; you just gave it to two different places?

A. Generally, yes, I give the same presentation. Sometimes it's titled different for the group.

Q. There's another one listed as Digital Evidence in Trucking Litigation. And that's given to multiple defense associations as well.

Is that one you recall doing?
A. Yes. If it's earlier than 2025, it might be different, because I had a different presentation with my former company.
Q. And I think you did one to Liberty Mutual Insurance for defending claims. Is that true as well?
A. Yes. If I recall, that was in person with my former employer.
Q. And then also it seems like a similar one to Great West Casualty Company; is that correct?
A. Yes. And that would be with my current employer and my current trucking presentation.
Q. All right. Have you ever presented to any plaintiffs' lawyers associations?
A. Great question. I have presented to plaintiff lawyers that I work with, but not in an official webinar capacity.
Q. So you've never presented to, let's say, American Association for Justice group or anything like that?
A. Not by that name. No.
Q. Let's turn to your list of testimony. How many civil cases have you actually testified

on behalf of a plaintiff?

A. None.

Q. So all of your testimony has been on behalf of trucking companies or insurance companies in defense of litigation; is that correct?

A. I didn't print this. But I think there's only one, and that would be the case in Iowa, correct, that you're referring to?

Q. Let's see. Hold on. I'll share the screen with you.

A. Thank you.

Q. Let me pull it up.

MR. BREWSTER: Can you read back the question, please?

MR. LANDRY: The question asked was whether -- it was a follow-up to the question about whether he ever testified on behalf of any plaintiff in a case. He said no. And I asked if all of his testimony has been in reference to defense of trucking companies or insurance companies.

MR. BREWSTER: Thank you.

A. So to clarify, in law enforcement I didn't really track all my testimony. I do know

ones that I did after I left, and I know my federal cases.

So those two federal cases, the first case is a case where I worked on behalf of the prosecution for a case that I had. The second case, I was representing the defendant, Gerry Byrd, in a criminal case.

And then the state case, that was me representing the prosecution in a murder that I worked.

And then the only civil trucking litigation case is the State of Iowa one where I worked on behalf of West Side Transport.

Q. (BY MR. LANDRY) So in looking at your testimony, the case of USA versus Wyatt is the first one listed, that was while you were still employed as a police officer; correct?

A. Correct.

Q. The case of USA versus Byrd, the testimony shows 2022, but was that for work that you had done as a police officer or was that in private practice?

A. That's private practice.

Q. Okay. And who had hired you in that case?

A. The federal public defenders in the state of Louisiana.

Q. Okay. Under State Testimony, you list -- in California -- State versus Balbuena, B-A-L-B-U-E-N-A. Testified in 2023. Was that from private practice or from your work as a police officer?

A. That was work from -- as a police officer.

Q. Do you know the result of that Iowa case that you testified in?

A. I do.

Q. And what was the result?

A. There was a finding of responsibility to a certain percentage for the trucking company, and I don't recall the exact percentage.

Q. There's a list of your deposition testimonies that follow. Were any of these depositions cases that you were testifying to arising from your police work before you started your consulting work?

A. No.

Q. Were any of these depositions cases in which you were engaged to represent a plaintiff or an injured party in an accident?

A. Yes.
Q. Which ones?
A. The first one that I recognize would be May 26, '23.
Q. And that is Skipper versus Fitzpatrick and Premiere Transportation; is that right?
A. That's correct.
Q. And you were hired by the plaintiff's counsel in that case?
A. That's correct.
Q. And any other cases?
A. I'm sorry. Please keep --
Q. I'll scroll up for you. I think that captures the rest of them.
A. I believe the June 30th one -- I believe I did that on behalf of the Shunnarah law firm, if I'm not mistaken, which would be --
Q. And that --
A. -- a plaintiff firm.
Q. That's McGill versus Rocky Ken Griggs and UPS?
A. Correct. And then the very last one is a civil case for a police officer that killed someone in the course of his duties. And I worked on behalf of the plaintiff, Ana Hernandez.

Q. As far as in your engagement as a consultant in cases, have you kept or do you know the percentage of times that you've been engaged for the plaintiffs versus the defense?

A. I try to give an approximation when I'm asked this question, and I would say that it's probably about 10 percent plaintiff work.

Q. What was your hourly rate in this particular case?

A. The one we're here for today, sir?

Q. Yes.

A. 400 an hour.

Q. Do you know how many hours you've billed on this case?

A. I don't recall at this time. I'd have to review an invoice.

Q. Are your invoices kept in your file or are your invoices kept somewhere else?

A. Our corporate people handle all of that. And I think it was probably produced by our corporate people.

Q. Do you have any idea how much money you have billed thus far in this case?

A. No. I'd have to see the invoice.

Q. Do you know how much you expect to bill

through trial?
A. I have no understanding of me going to trial at this point. But if I had to, it would be time onsite plus travel.
Q. At the same rate? $400 an hour?
A. Correct.
Q. How were you first contacted about this case?
A. I believe via email inquiry to our company, but I'd have to validate that.
Q. Is this the first case that you've worked for the Pugh law firm?
A. At this company, yes. The previous one, I wouldn't be able to speak on that, because I don't have the ability to look at that. But this is the only one I have at this time.
Q. What do you recall being told about this case at the outset?
MR. BREWSTER: Objection to the extent this calls for any privileged communications.
A. My understanding is generally what the report was is that our truck was on the side of the road when a collision occurred.
Q. (BY MR. LANDRY) Did you have a written

engagement letter or any type of retainer agreement?

A. I typically send over a budget. And any paperwork as far as the official engagement is handled by an administrative person.

Q. And who are those administrative -- who is that administrative person that handles that?

A. Her name is Malia, M-A-L-I-A. And the spelling of the last name, I believe, is H-A-N-D-L-O-N, if I'm not mistaken.

Q. What was it your understanding that you were being retained to do?

A. I think, as I stated earlier, to analyze Call Detail Records and report to identify what these records could lend context to around this particular collision time.

Q. And what is your understanding that they give context to?

MR. BREWSTER: Object to form.

(Simultaneous talking.)

A. I apologize. The cell towers being utilized by the device at specific times.

Q. (BY MR. LANDRY) Did you make note of the area code of the phone that was being communicated with during this period of time

relevant in your report?
A. To the extent that it's written in the documentation. But I did not research to find out what area it belongs to.
Q. Do you know generally what area 463 belongs to?
A. Not off the top of my head. No.
Q. In a way, Mr. Lorencz, is what you did in this case really just an interpretation of the AT&T records so that the jury can understand what the call data showed? Is that correct?
A. I think that's a fair representation.
Q. And secondly, to produce some visual representations of generally where the cell phones that were connected -- or the cell phone that was connected to this tower was from the scene of the accident; correct?
A. One more time, please.
Q. Yeah. The figures that are attached to your report, those are meant to be demonstrative to show where the tower locations were vis-a-vis the telephone number analyzed; correct?
A. Correct.
Q. Do you intend to supplement your report before trial in this matter?

A. Not without direction.

MR. LANDRY: I'm going to go off the record for just a few minutes and look over my notes. I think I'm pretty close to being complete. So why don't we go off the record for about five minutes, if that's all right.

THE VIDEOGRAPHER: We are going off the record at 10:57 a.m.

(Break.)

THE VIDEOGRAPHER: We are going back on the record at 11:07 a.m.

Q. (BY MR. LANDRY) All right. Sir, we're pretty close to closing on my questions today, but let me be clear just about what you actually did in this case.

You read the AT&T phone records over a five-hour period and made a report as to calls and texts that occurred; is that correct?

A. That's an oversimplification. No. I analyzed those records using my training and experience in how to interpret them, and then I mapped them.

Q. There are things that you did not analyze, like you did not analyze driver behavior; correct?

A. That's outside the purview of my role.
Q. You did not look at vehicle location during the calls, did you?
A. One more time, please.
Q. Vehicle locations during the calls.
A. That information is not afforded to me.
Q. You don't know what was discussed in any of the calls; correct?
A. Correct.
Q. And you don't know how phone use affected Saint Fleur's decisions? You offer no opinions on that, do you?
A. That's outside the purview of my role.
Q. If you had looked at Saint Fleur's deposition, the GPS records and the electronic logging data for the truck, you could have told us much more about whether the vehicle was stopped or moving at the time or its location; isn't that correct?
MR. BREWSTER: Objection to form. I think all this has been asked and answered. But respond if you can.
A. Yes.
Q. (BY MR. LANDRY) You could have even analyzed cell tower data that you already had for

the 24-hour period to show the duration and route for the entire trip, couldn't you have?

A. Whatever the duration of the records that were received, I could plot all of them.

Q. And the reason your analysis was so limited is because your client gave you a narrow assignment: Analyze the CDR and nothing more. Is that correct?

MR. BREWSTER: Objection to form.

A. These are the records that I was provided at this time. If there's more, I'm happy to help.

Q. (BY MR. LANDRY) And you never asked the client for depositions, GPS data or company phone policies, did you?

A. No.

MR. LANDRY: That's all the questions I have. Thank you.

EXAMINATION

BY MR. BREWSTER:

Q. Mr. Lorencz, this is Alex Brewster on behalf of Tara National. I just have a few questions I'd like to ask to clarify some things.

Based on my interpretation of some of Mr. Landry's questions, he has suggested that you

are a fact witness and not an expert witness.
You would agree that you provide factual testimony. However, you would also agree that factual testimony is derived from your expert analysis of the data that's been provided to you; correct?
A. That's correct.
Q. And the data that's been provided to you in this case, a lay -- would a layperson be able to analyze this data as you have done here?
A. No.
Q. And you've been able to analyze that data and issue a report based on your expertise in this field, your education and background; correct? And training; correct?
A. Yes.
MR. BREWSTER: No further questions. We'll reserve the right to ask any further questions at trial.
MR. COLLETTA: No questions.
MR. UTLEY: No questions.
MR. LANDRY: Will he read and sign, Alexander?
MR. BREWSTER: Josh, do you want to read and sign your deposition or waive it?

You have the right to do either.

THE WITNESS: I'll waive it. I don't need to sign it.

MR. BREWSTER: Okay.

THE VIDEOGRAPHER: We are going off the record at 11:12 a.m.

***

C E R T I F I C A T E

STATE OF LOUISIANA:
PARISH OF CADDO:

I, JAYNE M. REEVES, Certified Shorthand Reporter, in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that JOSH LORENCZ, after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinabove set forth in the foregoing 50 pages.

I further certify that this testimony was reported by me in the stenotype method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding.

I further certify that the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board, that I have acted in compliance with the prohibition on contractual relationships as defined by Louisiana Code of Civil Procedure Article 1434, and in rules and advisory opinions

of the board.

I further certify that I am not employed by nor related to any of the parties to this cause nor in any way interested in the event thereof.

SUBSCRIBED AND SWORN to the 8th day of April, 2026.

JAYNE M. REEVES, CCR
CCR #97006