*Transportation Compliance Experts, Inc.*
*4851 Wharf Parkway – Unit D-226*
*Orange Beach, AL 36561*
*251-923-4260(Office)*

*KEITH WILSON*
*DOT Compliance*
*931-231-4448(Cell)*
*Keith@transportationsafetyservices.com*

January 30, 2026
Alexander J. Brewster, Esquire
G. Benjamin Ward, Esquire
Lawrence G. Pugh, III, Esquire
PUGH ACCARDO
1100 Poydras Street, Suite 3600
New Orleans, LA 70163

RE: COLEMAN v TARA NATIONAL INC

Dear Mr. Brewster, Mr. Ward, & Mr. Pugh, III:

I have completed a summary of my opinions in the above case. My opinions are based on my knowledge and experience in the application of the Federal Motor Carrier Safety Regulations and applicable safety regulations at both the state and federal levels. Also, my opinions are drawn from a review of the documents provided to me to date and my understanding of the motor carrier industry. I reserve the right to amend or expand my opinions in this matter based on further testimony that I am provided or credible documents that are entered into evidence. This may include the testimony or documents related to other experts utilized in this case.

I have outlined my opinions in this case and have attached the following documents in support of my opinions in this matter:

1. Cover sheet for Report of Preliminary Opinion
2. Discussion of Basis for Opinions
3. Listing of Materials Reviewed in Case
4. Curriculum Vitae for Keith Wilson
5. Rule 26 Disclosure

Transportation Compliance Experts, Inc. is performing expert services in this matter under retainer agreement at an hourly rate of $300.

Thanks for letting me work with you on this case. If you have any questions related to my report, please do not hesitate to contact me directly.

Sincerely,

Keith Wilson

**EXHIBIT A**

**KEITH WILSON**
**DOT Compliance Expert**
Transportation Compliance Experts, Inc.
4851 Wharf Parkway Unit D-226
Orange Beach, Alabama 36561
(251)923-4260 Office
931-231-4448(Cell)
**Keith@TransportationSafetyServices.com**

# Report of Opinion

# COLEMAN v TARA NATIONAL INC

**Opinion Report Prepared for:**

**Alexander J. Brewster, Esquire**
**G. Benjamin Ward, Esquire**
**Lawrence C. Pugh, III, Esquire**
**PUGH ACCARDO**
**1100 Poydras Street, Suite 3600**
**New Orleans, LA 70163**
**504-312-4708**
***abrewster@pugh-law.com***
***gbward@pugh-law.com***
***lpugh@pugh-law.com***

**Date of Report:**
**January 30, 2026**

**Report Prepared by:**
**Keith Wilson**
**DOT Compliance Expert**
**Transportation Compliance Experts, Inc.**
**Keith@TransportationSafetyServices.com**

***The individual that prepared this report reserves the right to amend, expand, or formulate further opinions as more information becomes available.***

**KEITH WILSON**
**DOT Compliance Expert**
Transportation Compliance Experts, Inc.
4851 Wharf Parkway, Suite D-226
Orange Beach, AL 36561
251-923-4260 (Office)
931-231-4448(Cell)
Keith@transportationsafetyservices.com



# DISCUSSION OF BASIS FOR OPINIONS

The opinions outlined in this report relate to a crash that took place during interstate commerce operations on May 10, 2023, on Interstate 20 westbound near Bienville Parish, Louisiana. The subject crash involved a parked/stopped/standing commercial motor vehicle (CMV) that had been operated by Tara National, Inc., its driver, Marckson Saint Fleur (Saint Fleur), and another motorist, Ja'Vel Coleman (Coleman). My opinions regarding this matter relate to the applicability of the Federal Motor Carrier Safety Regulations (FMCSRs) and the industry standards of care as it pertains to Tara National, Inc. and driver Saint Fleur when the subject crash happened.

## BACKGROUND

For over three decades, I have combined experience in commercial motor vehicle (CMV) operations, DOT safety management, public safety, and accident investigation. I have held a Class A Commercial Driver's License since 2013, with endorsements for Hazardous Materials, Tank Vehicles, and Doubles/Triples. I have personally operated commercial motor vehicles using both manual and automatic transmissions, including flatbed, tanker, and dry van configurations, in local, regional, and over-the-road service. I have over thirteen (13) years of experience serving as a Director of Safety and Compliance for DOT-regulated motor carriers. My responsibilities included driver hiring and qualification oversight, Driver Qualification Files, accident investigation, FMCSR compliance, hazardous materials compliance, OSHA considerations, and state transportation codes. I have developed and implemented driver safety manuals, conducted driver training on DOT and FMCSA regulations, and overseen Entry-Level Driver Training programs. I hold professional certifications from the North American Transportation Management Institute (NATMI), including Motor Fleet Safety Basics, Managing Motor Fleet Safety Programs, and Certified Director of Safety (CDS). I have extensive experience in evaluating and oversight of Electronic Logging Device (ELD) systems, including Omnitracs, Qualcomm, and Samsara, as well as in-cab video and dash-camera systems such as Netradyne and Samsara. This experience allows me to assess carrier safety management controls, regulatory compliance, and driver conduct consistent with recognized industry standards and practices. In addition to my transportation background, I served approximately twenty (20) years in public safety as a medically licensed Critical Care Paramedic and Deputy Coroner. I have

responded to and investigated hundreds of motor vehicle and commercial motor vehicle accident scenes, including incidents involving serious injury and fatalities, and have assisted law enforcement with fatality scene investigations focusing on mechanism of injury and scene dynamics.

**OPINION #1**

**Tara National, Inc., and its driver, Marckson Saint Fleur, were subject to the Federal Motor Carrier Safety Regulations and the industry standards of care on May 10, 2023, the date of the subject crash.**

At the time of the accident, Tara National, Inc. was a duly registered for-hire interstate motor carrier engaged in the transportation of property assigned USDOT # 3165413 and MC# 114161. The motor carrier has routinely filed Federal Motor Carrier Safety Administration (FMCSA) Form MCS-150 in accordance with §390.19 of the FMCSRs, most recently on or about 8/15/2024, indicating they are familiar with the FMCSRs and/or Federal Hazardous Materials Regulations.

Operation as a motor carrier and having operated a commercial motor vehicle in interstate commerce prior to experiencing a mechanical failure on the date of the subject crash, subjects the motor carrier and its driver to USDOT regulation and the FMCSRs. The safety regulations provide that both a motor carrier and driver are bound by certain parts of the FMCSRs, with each bearing certain responsibility for transportation safety and compliance issues. These standards are outlined in 49 CFR Part 390.3(e) (1-2). Additionally, as outlined in 49 CFR Part 390.11, whenever an FMCSR duty or prohibition is prescribed for a driver, the employing and operative motor carrier shall require observance by the driver. Thus, Tara National, Inc. bore the responsibility of ensuring they had adequate safety management controls in place for their driver, Saint Fleur, to include, but not be limited to controlled substances and alcohol testing (Part 382), commercial drivers licensing requirements (Part 383), proper driver qualification (Part 391), safe driving (Part 392), hours of service compliance (Part 395), and inspection repair and maintenance of its assigned commercial motor vehicles (Part 396).

Based on documentation I reviewed, the subject CMV that Mr. Saint Fleur was operating prior to being parked/stopped/standing due to a mechanical failure had, in fact, passed the *annual inspection* as required by the FMCSR's Part 396.17 on March 5, 2023, just five days prior to the subject crash. The annual inspection is the most comprehensive vehicle safety inspection mandated by the Federal Motor Carrier Safety Regulations. This inspection indicates that at the time of inspection, the vehicle met FMCSA's mechanical safety standards and was not identified as having conditions that would render it unsafe for operation. This inspection is designed to identify defects that would not necessarily be detectable during a visual driver inspection or a roadside enforcement inspection. Accordingly, the documented inspection is consistent with reasonable and compliant maintenance practices under the FMCSRs and does not support conclusions that Tara National, Inc., failed to meet its regulatory inspection or maintenance obligations.

Under applicable commercial motor vehicle regulations, each state is required to administer knowledge and skills testing to all qualified applicants for commercial driver's licenses that meet the federal standard. The CDL standards outlined in the FMCSRs apply to both interstate and intrastate commercial motor vehicle operations. These regulations also establish testing and licensing requirements for commercial motor vehicle operators and set forth the required knowledge and skills testing requirements for the motor vehicle groups and endorsements. 49 C.F.R. § 383.111 (Required knowledge) requires state CDL licensing agencies to test the knowledge of each CMV applicant in twenty (20) general subject areas, including, but not limited to, the following:

Safe operations regulations: Driver-related elements of the regulations contained in Parts 391, 392, 393, 395, 396, and 397.

- motor vehicle inspection, repair, and maintenance requirements
- procedures for safe vehicle operations
- The effects of fatigue, vision, hearing, and general health on safe CMV operation
- The effects of alcohol and drug use.

Safe vehicle control systems: The purpose and function of the controls and instruments commonly found on commercial motor vehicles.

Visual search: The importance of proper visual search, and proper visual search methods, including: 1) Seeing ahead and to the sides, 2) Use of mirrors, and 3) Seeing to the rear.

Speed management: The importance of understanding the effects of speed, including: Speed and surface conditions and speed and the shape of the road.

Space management: The procedures and techniques for controlling space around the vehicle, including The importance of space management and space to the sides.

Emergency maneuvers: The basic information concerning when and how to make emergency maneuvers, including: Evasive steering, emergency stop, off-road recovery, brake failure, and blowouts.

Vehicle inspections: The objectives and proper procedures for performing vehicle safety inspections are as follows: 1) The importance of periodic inspections and repair to vehicle safety. 2) The effect of undiscovered malfunctions upon safety. 3) Identification of safety-related components when inspecting vehicles. 4) Pre-trip/enroute/post-trip inspection procedures. 5) Reporting findings.

Fatigue and awareness: Practices that are important to staying alert and safe while driving, including: 1) Being prepared to drive, 2) What to do when driving to avoid fatigue, 3) What to do when sleepy while driving, and 4) What to do when becoming ill while driving.

In addition to testing the required knowledge of each CMV operator as outlined above, the FMCSRs via 49 CFR Part 383.113 (Required skills) require each state to administer a test

evaluating specific skills of each CDL applicant to include, but not limited to, the following areas:

Pre-trip vehicle inspection skills. Applicants for a CDL must possess the following basic pre-trip vehicle inspection skills for the vehicle class that the driver operates or expects to operate: All test vehicles. Applicants must be able to identify each safety-related part on the vehicle and explain what needs to be inspected to ensure a safe operating condition of each part, including:

- Engine compartment
- Cab/engine start
- Steering
- Suspension
- Brakes
- Wheels
- Side of vehicle
- Rear of vehicle

Air brake equipped test vehicles: Applicants must demonstrate the following skills with respect to inspection and operation of air brakes:

- Locate and verbally identify air brake operating controls and monitoring devices;
- Determine the motor vehicle's brake system condition for proper adjustments, and that air system connections between motor vehicles have been properly made and secured;
- Inspect the low-pressure warning device(s) to ensure that they will activate in emergency situations
- With the engine running, make sure that the system maintains an adequate supply of compressed air
- Determine that required minimum air pressure build up time is within acceptable limits and that required alarms and emergency devices automatically deactivate at the proper pressure level
- Operationally check the brake system for proper performance

Once an applicant successfully meets the standards set by the Federal Motor Carrier Safety Regulations (FMCSRs), which are verified through testing by the appropriate State Driver's Licensing Agency (SDLA), the applicant is issued a Commercial Driver's License (CDL). This CDL confirms that the driver is knowledgeable about the necessary skills and safety requirements, including understanding key concepts such as CMV vehicle inspection, repair, and maintenance requirements, procedures for safe vehicle operations, and the effects of fatigue. The industry is reasonable to rely on the driver's knowledge and skills required to obtain their CDL license credential, in a manner like the way that FMCSA considers the possession of a CDL credential to be reliable, including to the level where it could waive the road test requirement if it chooses to do so.

Marckson Saint Fleur was issued and possessed a valid commercial driver's license (CDL) from the state of Florida CDL# S531-540-88-453-0 indicating he had been tested and trained on the Federal Motor Carrier Safety Regulations pursuant to 49 C.F.R. Part 383 and was confirmed to

be capable of reasonable and safe CMV operations when he was hired by Tara National, Inc., and at times relevant to the subject crash. These FMCSRs establish the industry standard of care for commercial motor vehicle operators regarding the knowledge and skills required for the type of motor vehicle or endorsement for which an applicant seeks to obtain a CDL.

## OPINION #2

**Tara National, Inc. was an unrated motor carrier of property having been found to possess adequate basic safety management controls in place, factually, at times relevant to the subject crash.**

An unrated status indicates that a motor carrier has not been subject to a comprehensive compliance review (rated review). It does not indicate a finding of noncompliance, unsafe operation, or deficient safety management controls.

Since at least 2010, FMCSA has monitored the safety metrics for motor carriers and has focused on evaluating fleets with comparably poor safety performances as part of its Safety Measurement System (SMS) program. When compliance reviews are performed because of SMS program scores, motor carriers found to be *without* adequate safety management controls are assigned formal safety ratings of either Conditional or Unsatisfactory.

Tara National, Inc. had not been assigned a Conditional or Unsatisfactory safety rating, and there is no evidence that FMCSA identified any safety management control failures requiring enforcement action. The absence of an adverse safety rating is consistent with a carrier that has not been found to exhibit systemic safety deficiencies under FMCSA's regulatory framework. Carriers that are not identified as having safety management control failures are often left unrated.

Any suggestion that an unrated status implies inadequate safety management or regulatory noncompliance, that position is unreasonable and inconsistent with FMCSA's safety rating and enforcement structure. FMCSA does not treat an unrated carrier as unsafe, nor does it equate the absence of a rated compliance review with a finding of deficient safety practices. Based on the available evidence, Tara National, Inc. possessed adequate basic safety management controls at times relevant to the subject crash.

## OPINION # 3

**The report and opinions issued by Eric Burson of First Responders dated December 15, 2025, do not align with and are incorrect when compared to applicable industry regulations and the industry standard of reasonable care. The actions taken by Tara National, Inc. and their driver Marckson Saint Fleur as it relates to the subject crash on May 10, 2023, were reasonable.**

My disagreements with Mr. Burson include, but may not be limited to, the following:

- Mr. Burson refers to the defendant correctly one time in his report by his legal name of **Marckson Saint Fleur**. Throughout his report, Mr. Burson failed to correctly refer to the defendant's name as follows: "*Saint Fleur (Mackerson), Saint Mackerson and multiple times as Mr. Mackerson*".

- Mr. Burson, on Page 18, lists Figures 15 and 16 in his report, but fails to list the source in his materials reviewed listing. The figures appear to be sections of an FMCSA SAFER Company Snapshot from 12/14/2025. The snapshots he uses are not time-relevant to the date of the subject accident in 2023 or to base his performance comments upon within his report.

- Mr. Burson, on Pages 16,19 and 23 refers to FMCSR 49 Code of Federal Regulations (CFR) Part 385, which outlines the industry Safety Fitness Procedures and the requirement that a carrier have adequate safety management controls in place for operation of its commercial motor vehicles.

    - Tara National Inc. obtained interstate operating authority issued by the Federal Motor Carrier Safety Administration (FMCSA), which was originally granted on 3/27/2020. In 2018, Tara National Inc. participated in FMCSA's New Entrant Safety Audit (NESA) program for its interstate authority to be made permanent. The safety audit is typically completed within the first 6 months of operations and is part of an 18-month NESA compliance monitoring period, during which motor carriers are closely monitored for compliance with the FMCSRs. Participating in and exiting from the NESA program is evidence that the company had adequate basic safety management controls in place. The evaluation consists of a wide range of compliance evaluations, including those related to its (1) driver training and qualification procedures and (2) vehicle inspection, repair, and maintenance program. Tara National, Inc., having been identified as having established adequate basic safety management controls, as stated above, was then granted permanent operating authority. After having its safety management controls evaluated and found to be sufficient, the company was subject to a DOT audit completed in 2022. After that investigation, it remained an unrated entity and with no evidence of deficient safety management controls. At the time of the subject crash, the carrier had been determined to have adequate safety management controls, factually. Adequate safety management controls are designed to minimize the occurrence of preventable commercial motor vehicle accidents.

- In multiple pages of his report, Mr. Burson suggests that Tara National Inc.'s failure to produce certain Department of Transportation (DOT) required documents as evidence of the company having failed safety management controls, or without having a safety program in place. FMCSR Part 385 requires that *patterns* of driver or vehicle non-compliance be present to be evidence of failed safety management controls. I have seen no such evidence in this case.

- Page 16 - *"Tara National, Inc.'s failure to produce virtually any required documentation is incompatible with these safety management requirements and is consistent with a carrier operating without an effective safety program."*
- Page 19 – *"The absence of documentation is not a minor administrative oversight. It reflects a systemic absence of safety oversight at every level of the organization."*

Mr. Burson's arguments are not consistent with the FMCSRs, and his argument is in direct conflict with them. Mr. Burson's argument that the absence of documents as narrow as the production in a lawsuit for a single driver or single vehicle reflects *"a systemic absence of safety oversight at every level of the organization"* is absurd and factually unsupportable under 49 CFR Part 385.5.

- Mr. Burson continues on Page 16 of his report to opine, *"Section 390.11 makes clear that a carrier is responsible for the acts and omissions of its drivers and for ensuring that its drivers comply with the FMCSR."* Notably, in this case to date, I have seen no evidence to support that the carrier or driver violated applicable regulations as it relates to the cause of the subject crash. Because such is the case, I see no value to his commentary.

- Mr. Burson refers to 49 CFR Part 391 on Page 16 and incorrectly opines that *"Failure to maintain a complete and accurate driver qualification file renders a driver unqualified as a matter of federal law and constitutes a violation by the motor carrier."* Burson appears to offer a legal conclusion, which is improper. It is likewise inconsistent with the FMCSRs. Mr. Saint Fleur has a history of being qualified by other motor carriers in the industry; the absence of "paperwork" in this case is unlikely to have been a causal factor to the subject crash. Further, I have seen no evidence that he was disqualified from commercial vehicle operations when the crash occurred, and the post-crash safety inspection identified no negative qualification or fitness determinations related to Mr. Saint Fleur relevant to the time of the crash.

- Mr. Burson misstates the provisions of 49 CFR Part 392.3 by saying *"that a driver not operate a commercial motor vehicle when the driver's ability* ***or the condition of the vehicle*** *is such that it is unsafe to do so."* His addition to the regulatory test appears intentional and meant to mislead the reader of his report. This regulation solely speaks to the driver's ability for safe operations due to illness or fatigue, not the condition of the vehicle. The regulation states the following:

  **§392.3 Ill or fatigued operator.**

  No driver shall operate a commercial motor vehicle, and a motor carrier shall not require or permit a driver to operate a commercial motor vehicle, while the *driver's ability or alertness* is so impaired, or so likely to become impaired, through fatigue, illness, or any other cause, as to make it unsafe for him/her to begin or continue to operate the commercial motor vehicle. However, in a case of grave emergency where the hazard to occupants of the commercial motor vehicle or other users of the highway would be increased by compliance with this section,

the driver may continue to operate the commercial motor vehicle to the nearest place at which that hazard is removed.

- Pages 16, 21-22 of Mr. Burson's report, he opines on 49 CFR 392.22 and the requirements to place warning devices behind a parked/stopped/standing CMV by Mr. Saint Fleur. He describes the purpose of and failure to properly place the warning devices, including:

  - *"…to warn approaching motorist of a stopped commercial vehicle and to prevent secondary collisions."*
  - *"…that the required warning devices were not placed in accordance with federal regulations, which significantly increased the risk of collision.*"
  - "*This arrangement did not provide approaching drivers with the early and clear warning contemplated by §392.22."*
  - *"…deprived approaching motorists of the reaction time they should have been afforded. This failure constitutes a violation of §392.22 and falls below the standard of care expected of a trained commercial driver."*

  Mr. Burson fails to clarify that the subject accident was ***not*** a secondary collision that could have been preventable by Mr. Saint Fleur, as he implies on Page 21 of his report.

  FMCSR § 392.22 establishes a sequential warning framework, not a hierarchy in which one warning method negates or replaces another. In addition to the activation of hazard warning flashers and the deployment of reflective warning triangles, the CMV was equipped with the federally required retroreflective conspicuity tape, all of which collectively served to present a reasonable and adequate visual warning to an oncoming, reasonably attentive motorist of the presence and location of the disabled commercial motor vehicle.

  The presence and adequacy of these warning measures were recognized by Louisiana State Police Master Trooper Jeffery Walker and observed and documented by Trooper Cade Talbert, the investigating law enforcement officer. The officers did not identify any violation related to warning devices, conspicuity, or vehicle visibility during the investigation. The only violation listed on the subject crash report was a citation issued by Trooper Walker to the Plaintiff.

  Mr. Burson's assertion that the use of activated hazard warning flashers is not equivalent to the placement of reflective warning triangles and his implication that the alleged deficiency of triangle placement constitutes a violation of §392.22 and falls below the standard of care expected of a CMV driver misstates the structure, purpose, and requirements of the regulation. Such is unreasonable.

- Pages 16–17 of his report, Mr. Burson asserts that the absence of Hours-of-Service (HOS) records produced in this case means the motor carrier *"cannot demonstrate that the driver was operating legally or safely."* The absence of HOS records does not

establish noncompliance, nor does it constitute evidence that Mr. Saint Fleur was operating illegally or unsafely. His opinion offers no evidence that Mr. Saint Fleur was out of hours, fatigued, or otherwise in violation of the HOS regulations.

Mr. Burson's HOS argument is unreasonable and irrelevant to the operational status of Mr. Saint Fleur and the CMV, which was legally parked/stopped/standing at the time of the subject crash.

- On pages 17 and 20 of Mr. Burson's report he references the FMCSR requirement that motor carriers systematically inspect, repair, and maintain their commercial motor vehicles and retain associated records. While such is the case, it is unreasonable for Mr. Burson to equate the absence of certain maintenance paperwork with a failure of safety management controls and regulatory noncompliance.

  On page 20, Mr. Burson argues, absent any records to support his argument, that *"Tara National, Inc. did not have a compliant maintenance program and did not systematically inspect, repair, and maintain its vehicles as required by Part 396."* This appears to imply that the 5/10/2023 subject mechanical failure could have absolutely been prevented, which again, is unreasonable.

  The FMCSRs require motor carriers to have inspection, repair, and maintenance programs in place; they do not establish that a documentation dispute or incomplete record production, standing alone, proves the absence or failure of such programs. Mr. Burson identifies no specific FMCSR violation, no enforcement finding, and no evidence that Tara National, Inc. lacked a functioning maintenance system at times relevant to the subject crash. To the contrary, the carrier had been determined to possess adequate safety management controls during the relevant period, which is inconsistent with Mr. Burson's implication of systemic maintenance failure; in my experience, it is expected that the exact same mechanical issues and component failures may occur even when a motor carrier maintains a compliant inspection and maintenance program.

- On page 18 of his report, Mr. Burson references a Conditional DOT safety rating assigned to Tara National, Inc., well after the subject crash, and he made a clear error about the date on which the audit happened. The audit did not occur on December 18, 2023, as he opines. The compliance review was conducted on October 13, 2023, and the Conditional safety rating was not assigned until December 18, 2023. Both events are not time-relevant and occurred well after the subject crash.

  Mr. Burson's discussion of the post-incident safety rating is unnecessarily inflammatory and his reliance on a post-incident Conditional safety rating, coupled with an incorrect audit date and the absence of any demonstrated relevance to the subject driver or vehicle, is unreasonable.

- I disagree with several additional opinions on page 19 of Mr. Burson's report.

He asserts that Tara National, Inc. "*produced virtually none of the records required under FMCSR Parts 382, 383, 390, 391, 392, 395, and 396*", and implies that this lack of production demonstrates the absence of safety systems or regulatory noncompliance on the part of Tara National, Inc. where they *"cannot prove"* that Mr. Saint Fleur was qualified, compliant with hours-of-service requirements, or operating a properly maintained vehicle, which in fact, was legally parked/stopped/standing. Mr. Burson's opinions are unreasonable and conflate litigation document production with FMCSA regulatory compliance.

- The FMCSRs require motor carriers to maintain specified records and to produce those records to ***FMCSA*** *upon request* for regulatory oversight and enforcement and not to Plaintiffs in litigation of a case of this nature.

- FMCSA compliance is determined by evidence of violations and not gaps in litigation production. Mr. Burson offers no evidence that Mr. Saint Fleur was disqualified to operate a CMV under Parts 383 or 391, no evidence of an HOS violation or noncompliance under Part 395, and no evidence of maintenance noncompliance under Part 396. He is equally unable to prove, to the contrary, for a CMV driver who was not disqualified when the subject crash occurred.

Mr. Burson argues that Tara National, Inc. did not produce "pre-trip inspection records". This opinion is unreasonable as it implies that this alleged absence reflects noncompliance or deficient safety practices. It misstates the FMCSRs and imposes a documentation requirement that does not factually exist.

The FMCSRs (49 CFR Part 396.13) require a driver to be satisfied that the commercial motor vehicle is in a safe operating condition before operating the vehicle. However, the regulations do not require a driver to prepare or retain a written pre-trip inspection record. The driver vehicle inspection report (DVIR) addressed in the FMCSRs is a *post-trip* document and is required *only* when defects or deficiencies are discovered. Where no defect is identified, there is no requirement that a written report be generated much less retained. Mr. Burson further fails to opine that the FMCSA retention requirement of post-trip inspection records is limited to 90 days. This mischaracterization of regulatory requirements renders yet another of Mr. Burson's conclusions unreliable and unsupported under the FMCSRs and accepted industry standards of care.

- On page 20, Mr. Burson opines *"Tara National, Inc. cannot show that it maintained a functioning drug and alcohol program or that its driver was legally authorized to perform safety sensitive functions under Part 382. Thistype of noncompliance is grounds for FMCSA enforcement and can result in a carrier being placed out of service."*

  - Mr. Burson overlooks the fact that a motor carrier identified as possessing adequate safety management controls is, by definition, recognized by FMCSA as

maintaining functioning compliance systems, which include a reasonably effective controlled substances and alcohol testing program.

- Mr. Burson offers no evidence or FMCSA finding, enforcement action, or audit result identifying any Part 382 deficiencies for Tara National, Inc. at times relevant to the subject crash.
- He presents no evidence that Mr. Saint Fleur was under the influence of drugs or alcohol, impaired, or otherwise prohibited from performing safety-sensitive functions. There was also no impairment or suspected impairment documented in the crash report.
- FMCSR §382.303 did not require Tara National, Inc. to administer DOT post-accident drug and alcohol testing to Mr. Saint Fleur regarding the subject accident.
- I have seen no evidence that Tara National, Inc., to date, has been found with drug testing deficiencies. Drug testing failures, by themselves, factually cannot be a basis for a carrier being placed out of service. That suggestion by Mr. Burson is incorrect and misleading.

- On page 20, Mr. Burson, while referring to Mr. Saint Fleur as "*Saint Fleur Mackerson*", further states, *"it is my opinion that Mr. Mackerson did not act as a reasonably prudent or properly trained professional commercial driver on the date of this incident."*

    - Mr. Burson, again, misidentifies the driver, fails to identify any violated FMCSR, cites no disqualifying condition, and points to no FMCSA-recognized training deficiency. Instead, he invokes the term "professional driver" to impose a heightened, perfection-based duty that does not exist under the FMCSRs. Mr. Burson's opinion ignores undisputed facts, including the absence of law enforcement citations and the lack of any FMCSA finding of noncompliance.

- On page 20, Mr. Burson argues that Mr. Saint Fleur was unreasonable in his chosen location to legally stop the disabled CMV on an improved shoulder adjacent to an interstate exit ramp stating the location was *"one of the most dangerous possible stopping points.."* and he argues further that *"Under §392.3 and §392.22, a driver who experiences a mechanical issue is required to proceed to the nearest safe location."*

    - Mr. Burson's arguments regarding unsafe stopping location are not only unreasonable but unsupported by the FMCSRs.
    - If industry standards of care or regulations deemed such locations as an unreasonable risk, they would be restricted or prohibited for parking/stopping/standing by force of law and regulation. They are not. The FMCSRs expressly anticipate that CMVs may become stopped or disabled on shoulders, including environments where the subject crash occurred, and respond to that reality by requiring layered warning and conspicuity measures. These measures are designed to provide advance notice and recognition to a reasonably attentive motorist of the presence and location of a stopped CMV in precisely the type of environment Mr. Burson describes.

    - Mr. Saint Fleur was reasonable on the date of the subject crash because he followed industry standards of care by his immediate activation of four-way hazard warning flashers, deployment of emergency warning triangles, and the passive warning presence of federally required conspicuity tape.
    - Mr. Burson misstates the FMCSRs by claiming that §§ 392.3 and 392.22 require a driver who experiences a mechanical issue *"is required to proceed to the nearest safe location."* Neither regulation imposes a duty or mandates to continue operating a CMV with a mechanical issue to reach a hypothetical alternative location or prohibits stopping at particular roadway features such as the taper of an exit ramp. Mr. Burson's argument inserts requirements that factually do not exist in the regulatory text. When a truck tractor experiences a tire failure, the vehicle is rendered in an out of service condition. Continued operations, as Mr. Burson suggests, would require Mr. Saint Fleur to operate his vehicle away from the scene in an out-of-service condition, which is not permitted by industry regulations.
    -

- Additionally on Page 20 of Mr. Burson's report, he states *"This location is one of the most dangerous possible stopping points because traffic exiting the interstate changes speed rapidly, drivers merge toward the right lane and shoulder, and driver attention is divided between deceleration, signage, and surrounding traffic."*

    - In my experience, driving operations involve risk for all driving parties, especially for drivers who are not attentive or operate outside of travel lanes. Mr. Burson continues by insinuating that stopping a commercial truck and trailer in this environment *"places the vehicle directly in the path of transitioning traffic with limited reaction time"* reflects classic but-for analysis and improperly reframes the conduct of other motorists as irrelevant. This approach is unreasonable.

- On page 21 of Mr. Burson's report, he opines, *"As a result, there is no objective record verifying when and where the truck and trailer stopped, whether an air system fault occurred, whether the vehicle remained drivable, or how long the driver had been operating before the incident. When ELD data is required but not produced, FMCSA presumes that the carrier either failed to equip the vehicle with a compliant device or failed to retain the required records. In either case, this is a serious compliance failure and prevents verification of the driver's account."*

    - Mr. Burson's assertion that the absence of produced ELD data constitutes a "serious compliance failure" that "prevents verification of the driver's account," and further suggesting that FMCSA presumes noncompliance when ELD data is

not produced, is unreasonable, inaccurate, and not supported by the Federal Motor Carrier Safety Regulations.

- Mr. Burson materially misstates the purpose and function of electronic logging devices. ELDs are designed to record Hours-of-Service status and duty time for drivers operating CMVs. They do not record whether a vehicle is mechanically drivable, whether an air system fault occurred, or the mechanical condition of the vehicle. As a former CMV safety director, I can state from experience that ELD data does not determine whether a vehicle remained operable or whether a mechanical failure existed. Mr. Burson's suggestion otherwise reflects a fundamental misunderstanding of ELD functionality.
- Mr. Burson's reliance on ELD data is irrelevant to the subject crash. At the time of the subject crash, the CMV was parked/stopped/standing, and Mr. Saint Fleur was not operating the vehicle. The HOS regulations govern driving and on-duty time while operating a CMV. Mr. Burson identifies no evidence of an HOS violation, no fatigue-related concern, and no FMCSRs that would make ELD compliance time relevant to the driver's conduct on the date of the subject crash.

- On Page 21 Mr. Burson describes, under §390.3, a duty to train its drivers and a lack of evidence of training as *"a significant safety management failure".* This opinion is unreasonable and not supported by the Federal Motor Carrier Safety Regulations.

  - 49 C.F.R. § 390.3 addresses the applicability of the FMCSRs; it does not require motor carriers to provide formalized or recurring training to experienced CMV drivers holding a valid commercial driver's license. A CDL is itself evidence that the driver has met federally mandated knowledge and skills standards, including vehicle operation, hazard recognition, and safety procedures.
  - In my experience as a CMV safety director, the FMCSRs do not require carriers to maintain driver handbooks, new-hire orientation records, or refresher training documentation as a condition of compliance.
  - Mr. Burson's conclusion that the driver's alleged *"noncompliance with basic safety procedures"* was *"predictable"* is unreasonable. He identifies no evidence of violated FMCSRs, no disqualifying conditions, and no violations demonstrating that the driver lacked competence, training, or regulatory knowledge. The driver was qualified under the FMCSRs, was not cited for any deficiency, and there is no evidence that FMCSA identified any training failures by Tara National, Inc. at times relevant to the subject crash.

- On page 22 of his report, Mr. Burson asserts that there is "no objective evidence" the truck and trailer were so disabled that they could not have been moved a short distance to a purportedly safer location, such as beyond the ramp or into the deceleration lane. On page 24, however, Mr. Burson states that the claimed air leak and other mechanical issues implicate 49 CFR Part 396 and the Commercial Vehicle Safety Alliance (CVSA) out-of-service criteria. These two opinions are inconsistent with industry regulations and the industry standard of reasonable care.

  - As stated earlier, the FMCSRs expressly contemplate that commercial motor vehicles may become stopped or disabled on a highway or shoulder for reasons other than routine traffic stops. In those circumstances, the regulations do not require a driver to relocate the vehicle to an alternative or "safer" location but provide guidance on what to do in those circumstances once the vehicle is stopped, including the activation of hazard warning signals and the deployment of emergency warning devices and as in doing so, to be reasonable.
  - Mr. Burson's suggestion that the vehicle should have been moved is incompatible with his own reliance on Part 396 and CVSA out-of-service criteria. If the air leak or related condition implicated CVSA out-of-service standards, industry expectations, and enforcement practice require the vehicle to be removed from service and not operated until repaired. Moving a CMV with an out-of-service condition for the purpose of reaching a different stopping location would itself be inconsistent with industry standards and regulatory expectations.

- In the opening portions of his report, Mr. Burson states that he will address accident preventability. *"…whether the collision was preventable under accepted commercial motor vehicle safety practices".*
  - In my review of the remainder of his report, it confirms that Mr. Burson never actually offers a defined, reasoned, or articulated a preventability opinion.
  - He does not apply FMCSA's preventability framework, does not identify a recognized preventability standard, and does not explain how the facts of the subject crash apply to any such standard.

## **OPINION # 4**

**In my experience, the subject crash meets the standard to be determined as non-preventable under the Federal Motor Carrier Safety Administration's Crash Preventability Determination Program (CPDP) to Tara National, Inc. and its driver Marckson Saint Fleur.**

FMCSA has created a specific and formal framework for evaluating preventability through its Crash Preventability Determination Program (CPDP). Under that program, FMCSA recognizes that crashes involving a legally stopped or disabled CMV struck by another vehicle in the rear falls within a category eligible for a determination of not preventable to the motor carrier and its driver, as was the case on the date of the subject crash.

Based on my review of the materials provided, applicable Federal Motor Carrier Safety Regulations, and accepted industry standards of care, the opinions offered by Eric Burson repeatedly depart from the proper regulations governing driver qualification, reasonable CMV driver conduct, and motor carrier compliance.

Rather than applying the FMCSRs as written, Mr. Burson relies on speculation, hindsight, and non-regulatory expectations to imply fault, noncompliance, and preventability without identifying any time-relevant FMCSR violation, disqualifying conditions, or enforcement of law findings. The time-relevant actions on the part of Tara National, Inc. and their driver Marckson Saint Fleur on the date of the subject crash were reasonable, complied with applicable Federal Motor Carrier Regulations and industry standards of care.

All opinions expressed in this report have been made with a reasonable degree of certainty. Because further documents or testimony may be presented requiring my review in the future, I reserve the right to supplement or change the opinions outlined in this report if needed.

**KEITH WILSON**
**DOT Compliance Expert**
Transportation Compliance Experts
4851 Wharf Parkway Unit D-226
Orange Beach, Alabama 36561
251-923-4260 (Office)
931-231-4448(Cell)
Keith@transportationsafetyservices.com

# MATERIALS REVIEWED COLEMAN V TARA NATIONAL INC

- **DEPOSITION TRANSCRIPT W/EXH – IVENT COLEMAN – 11/18/2025**
- **DEPOSITION TRANSCRIPT W/EXH'S- JA'VEL LARUE COLEMAN – 11/18/2025**
- **DEPOSITION TRANSCRIPT W/EXH'S – MARCKSON SAINT FLEUR – 11/05/2025**
- **DEPOSITION TRANSCRIPT W/EXH'S – TROOPER CADE TALBERT – 09/04/2025**
- **DEPOSITION TRANSCRIPT W/EXH'S – MASTER TROOPER JEFFREY WALKER – 09/04/2025**
- **DEPOSITION TRANSCRIPT W/EXH'S - GARY COOPER – 12/15/2025**
- **MS110525A1 (MP4)**
- **INITIAL DISCLOSURES: 01.07.25 - TARA NATIONAL INITIAL DISCLOSURES**
- **INITIAL DISCLOSURES: 01.17.25 - NAVIGATORES RULE 26 INITIAL DISCLOSURES**
- **INITIAL DISCLOSURES: 01.17.25 - SAINT FLEUR INITIAL DISCLOSURES**
- **INITIAL DISCLOSURES: 01.17.25 - TARA NATIONAL INITIAL DISCLOSURES**
- **INITIAL DISCLOSURES: 2025_01_17_PLA INITIAL DISCLOSURES**
- **INITIAL DISCLOSURES: THUMBS.DB**
- **NAVIGATORS RESP TO P 2ND DISC: BATES NUMBERS NAV-000136-NAV-000141(9531609.1)**
- **NAVIGATORS RESP TO P 2ND DISC: NAVIGATORS' RESPONSES TO PLAINTIFF'S SECOND SET OF INTERROGATORIES REQUESTS FOR ADMISSION AND REQUESTS FOR PRODUCTION**
- **NAVIGATORS RESP TO P 2ND DISC: THUMBS.DB**
- **NAVIGATORS RESP TO P DISC: RESPONSES TO WRITTEN DISCOVERY PROPOUNDED BY PLAINTIFF**
- **NAVIGATORS RESP TO P DISC: THUMBS.DB**
- **2025_07_11 PLTF ANSWERS TO SAINT FLEUR DISC REQ**
- **1-PLTF ANSWERS TO TARA DISC REQ**
- **2025.12.12 PLTF SUPP ANSWERS TO TARA DISC REQ**

- **THUMBS.DB**
- **ST. FLEUR RESP TO P DISC:25.08.28 ST.FLEUR ANS. TO PL 2ND SET OF RFA (FINAL)**
- **ST. FLEUR RESP TO P DISC:2025.04.02 ST. FLEUR ANSWER TO P RFA**
- **ST. FLEUR RESP TO P DISC:2025.08.29 ANS TO PL 1ST INT. AND RFP TO MARCKSON**
- **ST. FLEUR RESP TO P DISC:THUMBS.DB**
- **08.11.25 - TARA RESP TO P 2ND RFAS**
- **08.24.25 - TARA RESP TO P 2ND RFAS**
- **08.27.25 - TARA RESP TO P 2ND RFAS**
- **THUMBS.DB**
- **TARA RESP TO P DISC: 12.15.25 - TARA SUPP RESPS**
- **TARA RESP TO P DISC: 12.15.25 - TARA SUPP RESPS**
- **TARA RESP TO P DISC: TARA RESP TO P RFAS, ROGS, RFAS**
- **TARA RESP TO P DISC: TARA RESP TO P RFAS, ROGS, RFAS**
- **TARA RESP TO P DISC: THUMBS.DB**
- **AT&T SDT RETURN - DOCS FOR COUNSEL: ATT_RECORDS_KEY**
- **AT&T SDT RETURN - DOCS FOR COUNSEL: CRICKET BILLING REPORT**
- **AT&T SDT RETURN - DOCS FOR COUNSEL: DECLARATION_4351789**
- **AT&T SDT RETURN - DOCS FOR COUNSEL: REPORTAU_DATA USAGE (05.03.23 - 05.10.23)**
- **AT&T SDT RETURN - DOCS FOR COUNSEL: REPORTAU_SMS USAGE (05.03.23 - 05.10.23)**
- **AT&T SDT RETURN - DOCS FOR COUNSEL: REPORTAU_VOICE USAGE (05.03.23 - 05.10.23)**
- **AT&T SDT RETURN - DOCS FOR COUNSEL: REPORTLANDLINE_VOICE USAGE (05.03.23 - 05.10.23)**
- **AT&T SDT RETURN - DOCS FOR COUNSEL: SERVICE DOCUMENTS**
- **AT&T SDT RETURN - DOCS FOR COUNSEL: STIR REPORT (05.03.23 - 05.10.23)**
- **AT&T SDT RETURN - DOCS FOR COUNSEL: THUMBS.DB**
- **AT&T SDT RETURN: 549294661**
- **AT&T SDT RETURN: ATT_RECORDS_KEY**
- **AT&T SDT RETURN: REPORTAU_4351789**
- **AT&T SDT RETURN: REPORTAU_4351789.TXT**
- **AT&T SDT RETURN: REPORTCRICKET_4351789**
- **AT&T SDT RETURN: REPORTCRICKET_4351789.TXT**
- **AT&T SDT RETURN: REPORTICDR_4351789**
- **AT&T SDT RETURN: REPORTICDR_4351789.TXT**
- **AT&T SDT RETURN: REPORTLANDLINE_4351789**
- **AT&T SDT RETURN: REPORTLANDLINE_4351789.TXT**
- **AT&T SDT RETURN: REPORTSTIRSHAKEN_4351789**
- **AT&T SDT RETURN: REPORTSTIRSHAKEN_4351789.TXT**
- **AT&T SDT RETURN: THUMBS.DB**
- **BATES NUMBERS NAV-000001-NAV-000135 CERTIFED COPY OF POLICY**

- **THUMBS.DB**
- **BATES NUMBERS NAV-000136-NAV-000141(9531609.1)**
- **THUMBS.DB**
- **911 CALLS: 05-10-2023_05.16.59.2A_-_9_-_911_TRUNK_3_(VOICE)_2636615(WAVE SOUND)**
- **911 CALLS: 05-10-2023_05.17.03.3A_-_10_-_911_TRUNK_4_(VOICE)_3160553(WAVE SOUND)**
- **911 CALLS: 05-10-2023_05.18.15.8A_-_10_-_911_TRUNK_4_(VOICE)_7406315(WAVE SOUND)**
- **911 CALLS: 05-10-2023_05.18.26.1A_-_102_-_911_POSITION_2_VOIP_(VOICE)_2551284(WAVE SOUND)**
- **911 CALLS: 05-10-2023_05.26.07.9A_-_101_-_911_POSITION_1_VOIP_(VOICE)_9590728(WAVE SOUND)**
- **911 CALLS: 05-10-2023_05.28.38.7A_-_101_-_911_POSITION_1_VOIP_(VOICE)_5961731(WAVE SOUND)**
- **911 CALLS: CFS2305183**
- **2023_06_21_CRASH REPORT**
- **THUMBS.DB**
- **VIDEO FOOTAGE: EXTRACTION_1.1)_BIENVILLE-ASSIST_ON_CRASH_I20_AT_MP_55;_DRIVER_1_COLEMAN (MP4)**
- **P RESP TO TARA: EX A - PAFFORD EMERGENCY SERVICES**
- **P RESP TO TARA: EX B - OCHSNER**
- **P RESP TO TARA: EX C - RUSTON REGIONAL SPECIALTY HOSPITAL**
- **P RESP TO TARA: EX D - GREEN CLINIC**
- **P RESP TO TARA: EX E - MASSEY PT**
- **P RESP TO TARA: EX F - MAGNOLIA HOME HEALTH**
- **P RESP TO TARA: EX G - LOUISIANA PAIN CARE**
- **P RESP TO TARA: THUMBS.DB**
- **P RESP TO TARA: UM DEC PAGE**
- **TARA RESP TO P: RFP 2, 4, 5, & 49**
- **TARA RESP TO P: RFP 28**
- **TARA RESP TO P: RFP 47**
- **TARA RESP TO P: RFP 48**
- **TARA SUPP RESP TO P: (TN 74-77)**
- **TARA SUPP RESP TO P: (TN 78-105)**
- **TARA SUPP RESP TO P: (TN 106)**
- **TARA SUPP RESP TO P: (TN 107)**
- **TARA SUPP RESP TO P: DRIVER RECEIPT MARCKSON SAINT FLEUR 05-03-2023**
- **TARA SUPP RESP TO P: MARCKSON_SAINT FLEUR_APPLICATION 05-03-2023 (1)**
- **TARA SUPP RESP TO P: MEDICAL MARCKSON SAINT FLEUR 2-7-2025 (1) (JPEG)**
- **TARA SUPP RESP TO P: MEDICAL MARCKSON SAINT FLEUR 2-7-2025 (1)**

- **TARA SUPP RESP TO P: REQUEST FOR MEDICALS - OCHSNER LSU**
- **TARA SUPP RESP TO P: THUMBS.DB**
- **DISCOVERY RESPONSIVE DOCUMENTS: SSA-7050 - REV. 2024**
- **PETITIONS: 2024.07.12 NOTICE TO STATE COURT OF FILE OF PROVISIONAL NOTICE OF REMOVAL(8712246.1)**
- **PETITIONS: NEW - LA SUIT - JA'VEL COLEMAN V. TBIC**
- **PETITIONS: REC. DOC. 16 AMENDED COMPLAINT AGAINST SAINT FLEUR MACKERSON, NAVIGATORS INSURANCE CO, TARA NATIONAL**
- **PETITIONS: REC. DOC. 46 SECOND AMEDED COMPLAINT**
- **BODY CAM FOOTAGE: EXTRACTION_1.1)_BIENVILLE_-_COLEMAN (MP4)**
- **BODY CAM FOOTAGE: EXTRACTION_1.1)_BIENVILLE_-_COLEMAN-2 (MP4)**
- **BODY CAM FOOTAGE: EXTRACTION_1.1)_BIENVILLE-ASSIST_ON_CRASH_I20_AT_MP_55;_DRIVER_1_COLEMAN (MP4)**
- **BODY CAM FOOTAGE: EXTRACTION_1.1)_BIENVILLE-COLEMAN (MP4)**
- **BODY CAM FOOTAGE: EXTRACTION_1.1)_BIENVILLE-COLEMAN-2 (MP4)**
- **BODY CAM FOOTAGE: EXTRACTION_1.1)_BIENVILLE-CRASH_(ASSIST_ON_CRASH_DRIVER_1_COLEMAN) (MP4)**
- **BODY CAM FOOTAGE: BIENVILLE_-_COLEMAN (MP4)**
- **BODY CAM FOOTAGE: BIENVILLE_-_SAINT_FLEUR (MP4)**
- **BODY CAM FOOTAGE: BIENVILLE-ASSIST_ON_CRASH_I20_AT_MP_55;_DRIVER_1_COLEMAN (MP4)**
- **BODY CAM FOOTAGE: BIENVILLE-COLEMAN (MP4)**
- **BODY CAM FOOTAGE: BIENVILLE-COLEMAN-2 (MP4)**
- **BODY CAM FOOTAGE: BIENVILLE-COLEMAN-3 (MP4)**
- **BODY CAM FOOTAGE: BIENVILLE-CRASH_(ASSIST_ON_CRASH_DRIVER_1_COLEMAN) (MP4)**
- **PICS OF SCENE: 622300001 (JPG FILE) THROUGH 62230032 (JPG FILE)**
- **2025.12.15 BURSON REPORT**
- **REC. DOC. 46 SECOND AMEDED COMPLAINT**
- **DOT INSPECTION TRUCK #4617 05-05-2023**
- **REC. DOC. 67-5 MEMORANDUM IN SUPPORT**
- **REC. DOC. 69 OPP TO P MTC**
- **REC. DOC. 70 PL MEMO IN SUPPORT OF MOTION TO COMPEL**
- **FMCSA AUTHORITY HISTORY - TARA NATIONAL INC-KW**
- **FMCSA BASICS HISTORY-TARA NATIONAL INC-KW**
- **FMCSA SAFER DATA- COMPANY SNAPSOT- TARA NATIONAL INC-KW**
- **FMCSA SMS DATA - INVESTIGATIONS - TARA NATIONAL INC-KW**
- **L& I DATA - TARA NATIONAL INC**
- **REVOCATION OF AUTHORITY-TARA NATIONAL INC-KW**
- **LEASE AGREEMENT RSG MCKINZY ENTERPRISES LLC #4617**
- **FEDERAL MOTOR CARRIER SAFETY REGULATIONS AND INTERPRETATIONS THEREOF.**

**KEITH WILSON**
**DOT COMPLIANCE EXPERT**
Transportation Compliance Experts Inc.
4851 Wharf Parkway Unit D-226
Orange Beach, Alabama 36561
251-923-4260(Office)
931-231-4448(Cell)
**Keith@TransportationSafetyServices.com**



PROFESSIONAL EXPERIENCE

Transportation Compliance Experts. Inc, Current

Fleeman Carriers, Inc 2021-2025

Duties

- *Director of Safety*

Accomplishments

- In-depth knowledge of workplace safety and OSHA regulations.
- In-depth knowledge of FMCSA Code of Federal Regulations.
- In-depth knowledge of CSA Basics.
- In-depth knowledge of accident investigations and processing of accident claims for worker compensation, auto liability, physical damage and Cargo.
- Converted Driver DQF files into digital format.
- Implemented Samsara ELD, Camera and Trailer tracking systems.
- Implemented a digital maintenance record program for DOT Compliance.

Skills

- Possess excellent organizational, written and communication skills.
- In-depth knowledge of workplace safety and OSHA regulations.
- In-depth knowledge of FMCSA Code of Federal Regulations.
- In-depth knowledge of CSA Basics.
- In-depth knowledge of accident investigations and processing of accident claims for worker compensation, auto liability, physical damage and Cargo.

Sharp Transport, Inc 2015-2021

Duties

- *Director of Safety & Recruiting*

Accomplishments

- Developed a New Entry Level Driver Training Program.
- Developed and instructed a Train the Trainer program.
- Developed a Driver Mentorship for senior drivers to mentor younger drivers in driver safety.
- Converted Driver Qualification Files into a digital format for FMCSA Compliance.

- Developed a Flatbed Division driver safety program.
- Implemented Netradyne camera systems to the Fleet and O/O drivers.
- Implemented a quarterly on-line safety training program for all DOT regulated drivers.
- Developed and implemented a structured safety bonus program for safe drivers.
- Submitted many successful Data Q challenges on DOT Inspections. Skills

- Proficient in OSHA compliance to include OSHA 300 and 300A reporting.
- In-depth knowledge of FMCSA Code of Federal Regulations.
- In-depth knowledge of CSA Basics.
- In-depth knowledge of accident investigations and processing of accident claims for worker compensation, auto liability, physical damage and Cargo.
- Possessed excellent organizational, written and communication skills.

Seay Transport, LLC 2014-2015

Duties

- *Local CDL Driver*
- Logistics / Dispatch
- Compliance Officer
- Operations Manager (TN Division)

Accomplishments

- Responsible for overseeing DOT, HAZMAT and OSHA compliance.
- Developed a compliant HAZMAT driver training program.
- Developed a compliant HAZMAT Emergency Response Plan.
- Conducted safety training classes for driver orientation.
- Conducted FMCSA annual reviews.
- Conducted driver road tests.
- Conducted FMCSA compliant drug and alcohol testing for all safety sensitive DOT employees.
- Investigated CMV crashes and HAZMAT spills to identify root causes.
- Maintained compliance with FMCSA DQF
- Performed regular audits of DQF files
- Maintained and enforced compliance with FMCSA HOS regulations.
- Performed regular audits of driver HOS.

Skills

TDI Driving School 2013

- CDL-A Driving School

TMC Transportation 2013

Duties

- CDL-A Flat Bed Truck Driver

AIR-EVAC Life Team 2010-2011

Duties

- *Critical Care Flight Paramedic*

Accomplishments

- ☐ Provided advanced medical care and life support to critical patients and transported via air to definitive care.

Skills

- Excellent report writing skills necessary for patient care documentation that is subject to litigation.

Rutherford County Emergency Medical Service 1991-2009

Duties

- *Critical Care Paramedic*
- *Supervisor / Instructor*
- *Deputy Coroner*
- *Special Operations:*
    - *Hazmat Technician*
    - *Vehicle Extrication Technician / Instructor*
    - *Dive Rescue & Recovery*
    - *SWAT Deputy Sheriff / Medic*

Accomplishments

- Provided critical emergency patient care and transport to definitive care.
- Responded to hundreds of motor vehicle accidents requiring Jaws of Life extrication.
- Promoted to Supervisor and responsible for 8 EMS stations and 20+ employees.
- Served as Deputy Coroner for Rutherford County, TN.
- Responded to HAZMAT scenes utilizing Level 1 SCBA.
- Responded to water rescue emergencies, recovery of drowning victims and evidence using SCUBA.
- Responded to numerous high risk warrant scenes requiring special weapons and tactics.
- Served as a consultant through CRA with the US Dept of Homeland Security writing white papers and instructing public safety officials in WMD response, evidence collection in a WMD environment and (MCATI) Managing Civil Actions in Threat Incidents.

Skills

- Excellent report writing skills that were necessary for patient care reports, death investigations and other incidents all subject to litigation.
- Proficient with MS Word, Excel and Power Point.
- Excellent communication skills to interact with a diverse public.
- Excellent organizational skills.
- Proficient in accident and death investigations
- Skilled at multitasking in critical situations with a calm demeanor.
- Instructed classes to public safety personnel in the following areas:
    - Advanced Cardiac Life Support Instructor
    - Basic Trauma Life Support Instructor
    - Pediatric Advanced Life Support Instructor
    - Tactical Emergency Medical Care Instructor
    - Vehicle Extrication Instructor

Certifications / Licensure

- NATMI Certified Director of Safety

- CDL-A
- AHA CPR Instructor
- AHA Advanced Cardiac Life Support Instructor
- AHA Pediatric Life Support Instructor
- NAEMT Pre Hospital Trauma Life Support Instructor
- Neonatal Resuscitation Program Provider
- ITLS Advanced Trauma Life Support Instructor
- TARS - Vehicle Extrication Instructor

Education

- Smyrna High School - High school diploma
- Volunteer State Community College - Emergency Medical Technician Medical Licensure
- Tennessee Tech University - EMT Paramedic Medical Licensure
- Middle TN State University - Critical Care Paramedic Medical Licensure
- Air Evac Aeromedical Academy Advanced
- Massachusetts State Police Academy – SWAT Tactical Medical Operations
- CDI Commercial Driving School – Christiana, TN
- University of Denver Transportation and Supply Chain Institute - NATMI Certified Director of Safety

Professional Memberships

- Member North American Transportation Institute
- Member Tennessee Trucking Association
- Member National Association of Notaries
- NATMI CDS Mentor Career Development
- FEMA – Radiological Emergency Management
- FEMA – Introduction to Incident Command
- FEMA – ICS for Single Resources and Initial Action Incidents
- FEMA – National Incident Management System
- FEMA – National Response Planning
- NFA – Initial Response to Hazardous Materials / Concept Implementation
- NFA – Incident Command System
- NFA – Hazardous Materials Team Operations
- TEMA – Emergency Response to Terrorism
- AEU – Advanced Stroke Life Support
- AEU – Protocol Based Pharmacology
- AEU – Landing Zone Safety
- AEU – Night Vision Goggles for Flight Operations
- AEU – Hazmat 10
- USDOJ – Managing Civil Actions in Threat Incidents
- USDOJ – EMS Operations and Planning for Weapons of Mass Destruction

- Possessed excellent organizational, written and communication skills.
- In-depth knowledge of workplace safety and OSHA regulations.
- In-depth knowledge of FMCSA Code of Federal Regulations.
- In-depth knowledge of CSA Basics.
- In-depth knowledge of accident investigations and processing of accident claims for worker compensation, auto liability, physical damage and Cargo.

**RULE 26 TESTIMONY LISTING**

**KEITH WILSON - TRANSPORTATION COMPLIANCE EXPERTS**

**DOT EXPERT**

| YEAR | CASE NAME | DF/PL | COURT | | | COUNSELOR | LAW FIRM | DEPOSITION / TRIAL |
|---|---|---|---|---|---|---|---|---|
| | | | DISTRICT/DIVISION | COUNTY | STATE | | | |
| | THE EXPERT HAS NOT YET OFFERED DEPOSITION OR TESTIMONY. | | | | | | | |